# UNITED STATES COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO.:

KALICIA BATTLE,

                Plaintiff,

v.

THE CITY OF MIAMI GARDENS,

                Defendants.

_____/

## COMPLAINT

COMES NOW, Plaintiff, KALICIA BATTLE, by and through undersigned counsel, and bring this action against Defendant,  THE CITY OF MIAMI GARDENS ("Defendant" or The "City"), and as grounds thereof alleges as follows:

## INTRODUCTION

1.      This is an action against the Defendant to recover damages pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000(e)-(2)(a)(1), and 2000(e)-(3)(a) ("Title VII"), the Florida Civil Rights Act, Fla. Statute Chapter 760, *et seq.* ("FCRA").

2.      This action seeks legal, declaratory, injunctive and equitable relief, compensatory damages and costs and attorney's fees.

3.      KALICIA BATTLE is a 26-year-old black female. She was a 25-year-old rookie police officer at the time of the incidents alleged in the instant Complaint. On April 25, 2016, Ms. Battle was forced to resign her employment with the Miami Gardens Police Department. Her forced resignation was the end result of her rejecting the sexual advances made by then-Chief of Police Antonio Brooklen, including her refusal to participate in a *quid pro quo* sexual relationship with Chief Brooklen. Chief Brooklen pressured Ms. Battle into a sexual relationship, while

1

_____
**The Firm Law Group**
14100 Palmetto Frontage Road, Suite 390, Miami Lakes, FL 333016 ▪ ph 305.693.8899 ▪ fax 305.520.9992
**www.firmlawgroup.com**

*Battle v. The City of Miami Gardens*
Complaint

simultaneously having an extra-marital sexual relationship with Ms. Battle's girlfriend, fellow Miami Gardens Police Officer Kimberly McDonald. Ms. Battle's forced resignation was Chief Antonio Brooklen's attempt at covering up a minor incident which involved his lover, Officer McDonald, and her girlfriend, Ms. Battle, which occurred on April 18, 2016. Ample evidence exists showing that Chief Brooklen's cover-up conspiracy included, but was not limited to: official misconduct, witness tampering, and tampering with evidence, including by coercing his lover/subordinate at the department to destroy crucial evidence.

## <u>JURISDICTION</u>

4.      This court has jurisdiction under 28 U.S.C. §1331.

5.      Under 28 U.S.C. §1367(a), this court has supplemental jurisdiction over Plaintiff's state law claim in that it is so related to the federal claim that they form part of the same case or controversy under Article III of the United States Constitution.

6.      Venue in this District because CITY OF MIAMI GARDENS maintains offices, does business, and is located in Miami Gardens, Miami-Dade County, Florida. Additionally, venue is appropriate within this Federal District and Division because the injury was sustained, and the conduct and cause of action which gives rise to the instant suit occurred within Miami-Dade County, Florida.

7.      The Equal Employment Opportunity Commission issued its Notice of Right to Sue on October 2, 2017, which was received by Ms. Battle on October 6, 2017. As such, this action is timely filed within 90 days of receipt of the Notice.  *A true and correct copy of the Notice of Right to Sue is attached as Exhibit "A".*

_____
**The Firm Law Group**
14100 Palmetto Frontage Road, Suite 390, Miami Lakes, FL 33016 ▪ **ph** 305.693.8899 ▪ **fax** 305.675.0175
**www.firmlawgroup.com**

*Battle v. The City of Miami Gardens*
Complaint

## PARTIES

8.      At all times relevant to this Complaint, Plaintiff, KALICIA BATTLE ("Plaintiff" or "Ms. Battle" or "Officer Battle"), was and is a U.S. Citizen, over the age of 18, and a person with standing to bring a claim under the above-referenced statute by virtue of being directly affected by violations of the of Title VII and the FCRA. Ms. Battle was employed as a police officer with The City of Miami Gardens Police Department.

9.      Defendant, CITY OF MIAMI GARDENS, is a municipal subdivision of the State of Florida and, at all times material hereto, was engaged in an industry affecting commerce, employs more than 500 persons, and was Plaintiff's employer at the time of the actions giving rise to this cause of action.

## BACKGROUND AND GENERAL ALLEGATIONS

### History of Miami Gardens Police Chiefs

10.      Despite its incorporation as a city in 2003, The City of Miami Gardens Police Department was not formed and operational until 2007.

11.      In order to fully understand the nature of the events giving rise to the instant Complaint, it is both useful and imperative to delineate the history of leadership within the City of Miami Gardens.

12.      The City's first Chief of Police was Chief Matthew Boyd. Chief Boyd was the only acting Chief until he announced his resignation in December of 2013, amongst allegations of a department-wide Racial Discrimination Policy, targeting the City's young black male population.[1]

---

[1] *See* <u>Sampson v. The City of Miami Gardens, et al.</u>; Case No.: 13-24312-CIV-GRAHAM/GOODMAN

_____
**The Firm Law Group**
14100 Palmetto Frontage Road, Suite 390, Miami Lakes, FL 33016 ▪ **ph** 305.693.8899 ▪ **fax** 305.675.0175
**www.firmlawgroup.com**

13.    Amidst the same racial profiling scandal, then-Assistant Chief Paul Miller served as Interim Chief, until he too announced his own resignation two months later– agreeing to remain Interim Chief until the position was filled.

14.    In April of 2014, the City announced that Stephen Johnson would permanently fill the position of Chief of Police.

15.    In February 2015, less than a year after being hired, Chief Johnson was fired following his arrest in a prostitution sting conducted by the Broward Sherriff's Office, where he was caught soliciting two prostitutes.

16.    The City's latest vacancy drew the attention of over 50 highly qualified and distinguished veteran officers from all over the country, seeking employment as the new Miami Gardens Chief of Police.

**The Fall and Rise of Chief Antonio Brooklen**

17.    In 2007, Antonio Brooklen left the Miami-Dade Police Department ("MDPD") to come to the newly formed Miami Gardens Police Department run by long-time friend and mentor, Chief Matthew Boyd.

18.    In 2009, allegations of sexual misconduct and sexual harassment surfaced from a female crime scene technician for the MGPD.[2]

19.    Specifically, the Internal Affairs investigation found that Brooklen's actions were "clearly inappropriate and not within the guidelines of the department." Brooklen received a 30-day unpaid suspension and was demoted from Major to Captain.

--------

[2] *See* IA- 2009-016

_____
**The Firm Law Group**
14100 Palmetto Frontage Road, Suite 390, Miami Lakes, FL 33016 ▪ **ph** 305.693.8899 ▪ **fax** 305.675.0175
**www.firmlawgroup.com**

20.     In May 2014, then-Captain Antonio Brooklen was promoted to Assistant Chief, where he served during Chief Johnson's brief tenure, and subsequently as Interim Chief, during the City's search for a replacement for Chief Johnson.

21.     Notwithstanding the stellar applicant pool, City Manager Cameron Benson made the decision to promote from within and appointed then-Assistant/Interim Chief Antonio Brooklen (hereinafter "Brooklen" or "Chief Brooklen") to the permanent position.

22.     In a request for comment by local media on the recent hiring of Chief Brooklen, City Mayor Oliver Gilbert—a fellow Omega Psi Phi (ΩΨΦ) fraternity brother of Chief Brooklen—was quoted by local media outlets as saying, "'I don't live in a perfect world with perfect people, I live in a world where people make mistakes," Gilbert said. "Whatever mistakes Interim Chief Brooklen made six years ago, he's worked hard for the residents and people of Miami Gardens since then."' [3]

23.     On November 16, 2015, Brooklen was sworn in as the new Chief of Police.

24.     On September 22, 2016, three days after being served with a Notice of Intent to Sue the City for Chief Antonio Brooklen's sexual harassment and misconduct against Ms. Battle, Brooklen announced that he was resigning from his position, citing his mother's "fragile health" condition as his primary concern.

**Chief Brooklen's Interest in Officer Battle**

25.     From the very first day Chief Brooklen laid eyes on 25-year-old Kalicia Battle, she became the object of his unsolicited affection− at least <u>one</u> of the objects, as she would soon find out.

---

[3] http://miami.cbslocal.com/2016/09/22/miami-gardens-police-chief-announces-resignation/

_____
**The Firm Law Group**
14100 Palmetto Frontage Road, Suite 390, Miami Lakes, FL 33016 ▪ **ph** 305.693.8899 ▪ **fax** 305.675.0175
**www.firmlawgroup.com**

*Battle v. The City of Miami Gardens*
Complaint

26.     The date was April 30, 2015, and Ms. Battle came to City Hall to submit her application for employment as a police officer.

27.     As Ms. Battle was asking a city employee at the front information desk where she should drop off her application to become a police officer, the desk attendant pointed to a man walking toward them in a suit and said, "Why don't you ask the chief of police? He's right there."

28.     Chief Brooklen observed the employee pointing at him and immediately approached Ms. Battle and asked if he could help her. Upon learning that she was there to drop off her application to become a police officer for the City, he began asking her questions, starting with where she attended school. The two eventually even came to find out that Chief Brooklen's fellow brother of the well-known predominantly African-American fraternity of Omega Psi Phi ($\Omega\Psi\Phi$) was one of her professors at Florida Memorial College.

29.     The seemingly innocuous conversation ended with Chief Brooklen giving her his business card and asking for her cell phone number.

30.     Later the very same day, Ms. Battle received a text from an unsaved number that simply read "two weeks."  In a follow-up text, Ms. Battle learned that the cryptic text was from none other than Chief Brooklen, informing her of when her oral board examination was scheduled to take place.

31.     Ms. Battle was shocked to receive a response the very day she applied for the position, as she had previously gone through the rigorous process of being hired with the Lauderhill Police Department, only later to return to college for her undergraduate degree. Simply put, this type of turnaround time to receive a response after initiating the hiring process with any police department is utterly unheard-of.

_____
**The Firm Law Group**
14100 Palmetto Frontage Road, Suite 390, Miami Lakes, FL 33016 ▪ **ph** 305.693.8899 ▪ **fax** 305.675.0175
**www.firmlawgroup.com**

32.     Things became extremely clear in the weeks and months to follow, as Chief Brooklen, a married man, engaged in regular phone calls and texts, wherein he insisted on hanging out in person.

33.     One such message read, "Are you drunk… can I see you… I can come get you now."

34.     For weeks, Ms. Battle continuously evaded meeting with the Chief in person. Often claiming familial obligations or any other excuse she could conjure up to keep him at bay, while at the same time not angering him and jeopardizing the opportunity to work her dream job in the city she went to college in and truly wanted to make a difference in.

35.     One such early afternoon, Chief Brooklen asked Ms. Battle to meet in person to talk about "the hiring process," to which Ms. Battle finally acquiesced.

36.     Brooklen did not specify the location of the meeting, and at the last minute insisted that they meet at a strip club located in Miami Gardens, by the name of Tootsies Cabaret.[4] That evening, Chief Brooklen, out of uniform and dressed in a suit, told her to park her vehicle in the private garage adjacent to the strip club and walked her in through a private back entrance up to a private suite overlooking the main stage. During the course of the evening, Chief Brooklen made his first unsolicited physical contact with Ms. Battle, as he kissed her on the cheek.

37.     On August 10, 2015, Ms. Battle was hired as a police officer with MGPD.

38.     One of the first traumatic incidents that Ms. Battle recalls, shortly after being hired, is when Chief Brooklen called her one night and asked her to meet him at the old police station

---

[4] After "resigning" from MGPD, Chief Brooklen was subsequently employed as a security advisor for the entity that owns Tootsies Cabaret.

_____
**The Firm Law Group**
14100 Palmetto Frontage Road, Suite 390, Miami Lakes, FL 33016 ▪ **ph** 305.693.8899 ▪ **fax** 305.675.0175
**www.firmlawgroup.com**

and speak about her status as a Field Training Officer ("FTO"). Fearful of upsetting the Chief during her initial FTO probationary period as a new officer, Ms. Battle again acquiesced.

39.     Upon arrival, Chief Brooklen asked her to get into his tan Ford Expedition− a City issued vehicle. Ms. Battle entered the vehicle and Chief Brooklen subsequently began groping her legs and chest, in the very parking lot of the police station he was tasked with commanding.

40.     Ms. Battle attempted to deny his advances by stating that she had to go home because her father was waiting for her.

41.     After said incident, Chief Brooklen would call from the station and ask if she was avoiding him. He would regularly threaten to get her in trouble and "joke" that she didn't want to go back to working as a security guard.

42.      On yet another occasion, Ms. Battle and fellow rookie Officer Deandre Morris were called to meet in Chief Brooklen's office. Officer Morris went in first. When he was done speaking privately with Chief Brooklen, Kalicia then entered the office alone. Wherein Chief Brooklen proceeded to close the door behind him and put his hand in her pants. Ms. Battle was frozen in shock. Chief Brooklen then told her to sit down and asked if "she was excited." Not knowing what to say in such a situation with such a powerful authority figure, Ms. Battle forced herself to say that she was.

43.      After Ms. Battle somewhat successfully distanced herself from Chief Brooklen, by ignoring his calls and refusing to meet with him privately in person, she was retaliated against by being forced to work solely during night shifts, while her fellow FTOs alternated between day and night shift, as was the normal training procedure for the department.

8

_____
**The Firm Law Group**
14100 Palmetto Frontage Road, Suite 390, Miami Lakes, FL 33016 ▪ **ph** 305.693.8899 ▪ **fax** 305.675.0175
**www.firmlawgroup.com**

*Battle v. The City of Miami Gardens*
Complaint

44.     Ms. Battle went as far as to complain about the harassment to Captain Carole Thony, but her situation only became worse.

**Chief Brooklen's Tryst with Officer Kimberly McDonald**

45.     During Ms. Battle's 4th Phase of FTO, she met Officer McDonald while responding to a call one day, and the two began to take interest in one another.

46.     At the time, Officer McDonald had been with the department for about a year.

47.     As the two became romantically involved, McDonald confided in Ms. Battle via text message that she was sleeping with Chief Brooklen and that he was physically abusive and she was afraid of him.

48.      As the two decided to make their relationship exclusive, McDonald went on to promise Ms. Battle that she would end things with Chief Brooklen.

49.     During the course of their relationship, Ms. Battle regularly passed by McDonald's house, which was located in Miami Gardens, when McDonald was off-duty, in order to check on her, eat and use the restroom.

**The McDonald Incident**

50.      On April 18, 2016, Ms. Battle was assigned to work in District 1− the same zone that McDonald lived in.

51.     While driving down McDonald's street, Ms. Battle spotted an unmarked vehicle in the driveway.

52.     Fearful that Chief Brooklen may be in the house with McDonald and that McDonald may be in danger, Ms. Battle knocked on the door and McDonald, visually nervous, came outside and shut the door behind her.

_____
**The Firm Law Group**
14100 Palmetto Frontage Road, Suite 390, Miami Lakes, FL 33016 ▪ **ph** 305.693.8899 ▪ **fax** 305.675.0175
**www.firmlawgroup.com**

*Battle v. The City of Miami Gardens*
Complaint

53.     Ms. Battle proceeded to question her about who was inside; McDonald refused to respond. Ms. Battle was about to leave, but just could not rid herself of the feeling that Chief Brooklen may be posing a threat within the house, so she returned to the front of the house and knocked on door again.

54.     This time, a familiar face answered the door. It was mutual friend and Opa Locka Police Officer Simon Lowery, who was off-duty at the time.

55.     Ms. Battle was surprised because she knew that Officer Lowery normally worked the same shifts as her in the nearby city.[5]

56.     Ms. Battle and McDonald began arguing about whether Chief Brooklen was also inside the house, and once again, McDonald refused to tell her. Instead McDonald turned her back to Ms. Battle and attempted to walk back inside.

57.     Ms. Battle attempted to grab McDonald's arm to prevent her from going back in the house, at which point McDonald quickly turned around, scratching Ms. Battle in the face.

58.     At that moment, Ms. Battle was dispatched and immediately responded to a domestic violence incident at a local hotel in her district.

**Ms. Battle's Forced Resignation**

59.     Immediately after Officer Battle was finished responding to the call at the hotel, MGPD Sgt. Javier Romaguera called Ms. Battle on her cell phone and asked her to come to the station to talk and see if she was okay.

---

[5] It was later discovered that Officer Lowery called out sick that day from work. He was later reprimanded for the incident with his department.

_____
**The Firm Law Group**
14100 Palmetto Frontage Road, Suite 390, Miami Lakes, FL 33016 ▪ **ph** 305.693.8899 ▪ **fax** 305.675.0175
**www.firmlawgroup.com**

*Battle v. The City of Miami Gardens*
Complaint

60.     Unbeknownst to Officer Battle, MGPD had already been informed about the incident.

61.     Upon arriving at MGPD Headquarters, Ms. Battle was approached by Officer Mike Perez, along with two other officers.

62.     Officer Battle's gun, tazer, and personal cell phone were immediately removed from her and she was taken up to one of the sergeant's offices.

63.     Despite asking fellow officers what was going on, Officer Battle was not provided an explanation of why she was stripped of her weapon and detained.

64.     Confused and scared, Officer Battle called Chief Brooklen and asked if he knew what was going on. He said he did not know, but that it may be some sort of a mistake and that he would look into it.

65.     Officer Battle was then transferred to another empty room, where she was unlawfully detained by Captain Carole Thony and Sgt. Dwayne Piper for 4 hrs.

66.     After 4 long hours, Sgt. Buddy Hunholz, the head of internal affairs, and Commander Chuck Wagoner took her in yet another room that resembled a break room.

67.     Realizing that she was under investigation, Officer Battle invoked her Law Enforcement Officers' Bill of Rights ("OBR"), which governs how the interrogation of officers under investigation is to be handled.

68.     In doing so, Officer Battle requested to be placed in one of the station's interrogation rooms, outfitted with extensive audio and video equipment; however, her request was refused.

_____
**The Firm Law Group**
14100 Palmetto Frontage Road, Suite 390, Miami Lakes, FL 33016 ▪ **ph** 305.693.8899 ▪ **fax** 305.675.0175
**www.firmlawgroup.com**

*Battle v. The City of Miami Gardens*
Complaint

69.     Officer Battle, still unaware of the reason she was being unlawfully detained and interrogated, asked if it had anything to do with her relationship with Chief Brooklen. To which Sgt. Hunholz and Commander Wagon responded with threats of incarceration if she ever mentioned anything about her relationship with Chief Brooklen.

70.     Sgt. Hunholz and Commander Wagoner even went as far as to place an orange jump suit at the corner of the desk and read her Miranda Rights.

71.     Over four hours after initially being detained, as the interrogation finally began, Sgt. Hunholz and Commander Wagoner used a handheld tape recorder to tape the interrogation. Again, contrary to the OBR, the officers would strategically stop the recording and conduct the interrogations off the record, and then begin recording again whenever they wanted to.

72.     Officer Battle was told that she was facing charges of stalking, armed burglary, and battery.

73.     Officer Battle was taken back by the allegations, as she informed Sgt. Hunholz and Commander Wagoner that she had ample evidence of text messages that would prove that all encounters with McDonald were purely consensual.

74.     Under duress, Sgt. Hunholz and Commander Wagoner forced Officer Battle to sign a written consent to search her cell phone. No audio was ever recorded during this portion of the interrogation.

75.     Once the Consent was signed, Sgt. Hunholz and Commander Wagoner forced Officer Battle to unlock the cell phone with her thumb print. They then forced her to delete all texts between her and McDonald.

_____
**The Firm Law Group**
14100 Palmetto Frontage Road, Suite 390, Miami Lakes, FL 33016 ▪ **ph** 305.693.8899 ▪ **fax** 305.675.0175
**www.firmlawgroup.com**

*Battle v. The City of Miami Gardens*
Complaint

76.     Once deleted, all her personal belongings were placed in a box and she was driven home by another officer.

77.     The following day, Officer Battle received a call from Sgt. Hunholz and was told to meet him at Publix, where she was served with the first of two Petitions for Injunction for Protection Against Domestic Violence and Temporary Restraining Order filed by Officer McDonald ("TRO").

78.     Officer Battle finally told her father, John Battle, a former police officer with the Broward Sherriff's Office, the story of what was going on. Mr. Battle took it upon himself to reach out to Chief Brooklen and the two had a meeting at a local park.

79.     During the course of the meeting with Chief Brooklen and Mr. Battle, Brooklen was informed that Officer Battle had all the text messages on her phone saved to her iCloud, and that she could prove that she was not stalking McDonald.

80.     The following day, the TRO was voluntarily dismissed by McDonald.

81.     On or about May 18, 2016, while still suspended, Chief Brooklen contacted Officer Battle and the two met in Hollywood behind some warehouses.

82.     Chief Brooklen proceeded to explain to Officer Battle that it was not him that wanted her fired from the City, but rather City Manager Cameron Benson.

83.     Chief Brooklen told Officer Battle that if she did not resign from the department he would force McDonald to reopen the fabricated criminal case against her and ruin her career.

84.     Chief Brooklen finished the conversation by telling Officer Battle not to send her resignation letter to anyone but him.

_____
**The Firm Law Group**
14100 Palmetto Frontage Road, Suite 390, Miami Lakes, FL 33016 ▪ **ph** 305.693.8899 ▪ **fax** 305.675.0175
**www.firmlawgroup.com**

*Battle v. The City of Miami Gardens*
Complaint

85.     Faced with no other reasonable alternative, Officer Battle was effectively forced to resign.

86.     Battle emailed her resignation letter to Chief Brooklen, who made minor edits to it and told her to sign and date it, before replying in the body of the email, "if this is what you want."

87.     Ms. Battle subsequently received a call from The City's Human Resources Department, who explained her severance benefits and said that her file has been cleared and that she was good to apply somewhere else.

**Continued Harassment and The Coverup**

88.     A few weeks after her forced resignation, Ms. Battle called Chief Brooklen and told him she needed her file to apply for a position at Broward Sherriff's Office ("BSO").

89.     Upon receipt, Ms. Battle noticed that both the separation affidavit and the jacket of the file was missing was missing the city manager's signature on.

90.     Ms. Battle made a copy of the file and turned it in to BSO.

91.      On June 2, 2016, BSO sent an email stating it was not moving forward with her application.

92.      Shortly thereafter, Ms. Battle received a call from a blocked number. The woman who called identified herself as a BSO employee, and proceeded to confidentially tell her that Chief Brooklen blocked her application.

93.     Ms. Battle next applied to Key Biscayne's Police Department, where she went very far in the hiring process, including a final interview with Chief of Police.

_____
**The Firm Law Group**
14100 Palmetto Frontage Road, Suite 390, Miami Lakes, FL 33016 ▪ **ph** 305.693.8899 ▪ **fax** 305.675.0175
**www.firmlawgroup.com**

*Battle v. The City of Miami Gardens*
Complaint

94.     When the Key Biscayne PD tried to contact Brooklen for a letter of explanation of her departure, Chief Brooklen maliciously instructed his secretary not to respond to the inquiry or provide the letter needed to hire her.

95.     Frustrated with the ongoing malicious harassment of Chief Brooklen, Ms. Battle hired Attorney Levi Williams, Jr., who send a letter to the City advising that he was retained to represent Ms. Battle and is investigating the circumstances surround her forced resignation with the City.

96.     Realizing the City's potential exposure for future litigation, it began the process of "rehiring" Ms. Battle to cover up what really occurred.

97.     On or about June 15, 2016, shortly after Attorney Williams' correspondence to the City, Ms. Battle, then in the process of applying for employment with the Miccosukee Police Department, received an email from the City discussing the possibility of rehiring her.

98.     The email extended Ms. Battle the opportunity for employment with the City once again, and went on to state that she would not have to retake the psychological or polygraph examinations again, as her current passing scores on those exams were still valid.

99.     Based on the City's fraudulent and intentional representations, Ms. Battle withdrew her application and abandoned the hiring process with the Miccosukee PD.

100.    Oddly, in further communications with the City, Ms. Battle was told by Human Resources that in order to be rehired she must appeal her own decision to resign, to which she reluctantly obliged.

101.    Ms. Battle next received a phone call from City Manager's office requesting a meeting.

_____
**The Firm Law Group**
14100 Palmetto Frontage Road, Suite 390, Miami Lakes, FL 33016 ▪ **ph** 305.693.8899 ▪ **fax** 305.675.0175
**www.firmlawgroup.com**

*Battle v. The City of Miami Gardens*
Complaint

102.    A meeting eventually took place on June 30, 2016, and in attendance were City Manager Cameron Benson, Human Resources Head Melissa Negron, Assistant Chief Cynthia Mechanic, Officer Kimberly McDonald, and Chief Antonio Brooklen.  The parties came to an understanding that the incident at Officer McDonald's house was simply a misunderstanding, and Ms. Battle and McDonald shook hands at the end of the meeting.

103.    A second meeting with Ms. Battle and the City took place the following week, on or about July 5, 2016.  In attendance for the City was City Manager Cameron and Melissa Negron. It was at this meeting that Ms. Battle was once again welcomed back as Officer Battle.

104.    During the meeting, Ms. Battle also spoke alone with City Manager Benson and discussed some concerns that she had with the copy of her employment file that was previously provided to her by Chief Brooklen—namely a document that said she was not eligible for rehire.

105.    City Manager Benson noticed that key documents were missing from her file and stated that he never designated her as a former employee who was not eligible for rehire; however, he told her not to worry about it, that he would straighten everything out.

106.    At the conclusion of the meeting, Ms. Battle was told that she would be receiving a start date shortly.

107.    On September 12, 2016, while waiting to receive her start date, Ms. Battle inexplicably received the attached Correspondence informing her of the City's decision not to rehire.  *A copy of the Letter is attached hereto and marked Exhibit "B"*

108.    As a direct and proximate result of the acts and omissions set forth above, Plaintiff has suffered the following injuries:

      a.   Pain and suffering.

_____
**The Firm Law Group**
14100 Palmetto Frontage Road, Suite 390, Miami Lakes, FL 33016 ▪ **ph** 305.693.8899 ▪ **fax** 305.675.0175
**www.firmlawgroup.com**

*Battle v. The City of Miami Gardens*
Complaint

    b.  Mental anguish, including but not limited to embarrassment, humiliation, personal inconvenience, and emotional distress;

    c.  Loss of capacity for the enjoyment of life;

    d.  Deprivation of life, liberty and property;

    e.  Legal fees and expenses;

    f.  Loss of earnings in the past and future;

    g.  Loss of earning capacity;

    h.  Injury to reputation;

    i.  Loss of the rights described herein;

    j.  Back Pay;

    k.  The reinstatement to employment and all benefits that she would have enjoyed but for the wrongful discharge including, but not limited to, bonuses, retirement and pension benefits, health insurance, meal benefits, and vacation benefits;

    l.  Incidental expenses;

    m.  Reinstatement or Front pay and benefits until Plaintiff attains the age of 70 and/or a reasonable time;

    n.  Liquidated damages;

    o.  Any other relief this Court deems just and equitable.

Said damages are continuing in nature and Plaintiff will so suffer in the future.

    109.   Plaintiff has no plain, adequate or complete remedy at law to redress the wrongs alleged and is now suffering and will continue to suffer irreparable injury from the treatment by Defendant unless Defendant is enjoined by this Court's injunctive powers.

    110.   As a direct and proximate result of the actions or omissions, Plaintiff has been

_____
**The Firm Law Group**
14100 Palmetto Frontage Road, Suite 390, Miami Lakes, FL 33016 ▪ **ph** 305.693.8899 ▪ **fax** 305.675.0175
**www.firmlawgroup.com**

*Battle v. The City of Miami Gardens*
Complaint

forced to hire an attorney and pay him a reasonable fee, which she is entitled to recover pursuant to 42 U.S.C. Section 2000(e)-(5)(k), the Florida Civil Right Act, and as otherwise provided by law.

## COUNT I

**Claim for Hostile Work Environment in Violation of 42 U.S.C. Section 2000(e)-2(a)(1)**

111.    Plaintiff, KALICIA BATTLE, re-alleges and re-incorporates Paragraphs 1 through 110.

112.    This is an action to recover damages and injunctive relief for hostile work environment brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000(e)-(2)(a)(1).

113.    The actions taken by Defendant are in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000(e)-(2)(a)(1).

114.    Plaintiff belongs to a protected class within the meaning of 42 U.S.C. Section 2000(e)-(a)(a)(1) because she is female.

115.    As set forth above, Plaintiff has been subject to unwelcome harassment, discrimination and retaliation in the form of sexual harassment by words, comments, and actions and other conduct as set forth herein.

116.    The harassment Plaintiff endured was because of her gender because no men were treated in this manner.

117.    As set forth above, the harassment was sufficiently severe or pervasive so as to alter the terms and conditions of employment and create a discriminatory abusive working environment.

_____
**The Firm Law Group**
14100 Palmetto Frontage Road, Suite 390, Miami Lakes, FL 33016 ▪ **ph** 305.693.8899 ▪ **fax** 305.675.0175
**www.firmlawgroup.com**

*Battle v. The City of Miami Gardens*
Complaint

118.    Defendant is liable because, as set forth above, its supervisory personnel, Chief Antonio Brooklen, was responsible for the discriminatory actions complained of, which actions were in violation of law, and no corrective action to stop and/or prevent it was undertaken by it.

119.    As a direct and proximate result of the actions or omissions of Defendant, Plaintiff has sustained those damages set forth above, all of which she is entitled to recover by law.

120.    As a result of the deprivations of rights at the hands of Defendant, Plaintiff has been forced to hire an attorney and pay him a reasonable fee, which he is entitled to recover pursuant to 42 U.S.C. Section 2000(e)-(5)(k) and otherwise by law.

WHEREFORE, Plaintiff, KALICIA BATTLE, demands judgment against the Defendant for damages as set forth above, plus injunctive relief, back pay, front pay, the costs of this action, attorney's fees pursuant to 42 U.S.C. Section 2000(e)-(5)(k), and further demands judgment for such other relief as this Court deems just and equitable and further demands trial by jury for all issues so triable of right by jury.

## <u>COUNT II</u>

**Hostile Work Environment in Violation of Florida Civil Rights Act, Fla. Stat. Ch. 760**

121.    Plaintiff adopts and realleges the jurisdictional and general allegations of paragraphs 1 through 110.

122.    This is an action for damages and injunctive relief brought pursuant to the FCRA.

_____
**The Firm Law Group**
14100 Palmetto Frontage Road, Suite 390, Miami Lakes, FL 33016 ▪ **ph** 305.693.8899 ▪ **fax** 305.675.0175
**www.firmlawgroup.com**

*Battle v. The City of Miami Gardens*
Complaint

123.     The conduct of the Defendant to the Plaintiff in relation to the conduct described above was in violation of the Florida Civil Rights Act of 1992, as established at Florida Statutes Chapter 760.

124.     Plaintiff belongs to a protected class within the meaning of the Florida Civil Rights Act, Florida Statutes Chapter 760, because she is a female.

125.     As set forth above, Plaintiff has been subject to unwelcome harassment.

126.     The harassment Plaintiff endured was because of her gender because no men were treated in this manner.

127.     As set forth above, the harassment was sufficiently severe or pervasive so as to alter the terms and conditions of employment and create a discriminatory abusive working environment.

128.     Defendant is liable because, as set forth above, its supervisory personnel, Chief Brookeln, was responsible for the actions complained of.

129.     As a direct and proximate result of the actions or omissions of Defendant to Plaintiff has sustained those damages set forth above, all of which she is entitled to recover under the terms of the Florida Civil Rights Act of 1992, as established at Florida Statutes Chapter 760, *et seq.*

130.     As a result of the deprivations of rights at the hands of Defendant, Plaintiff has been forced to hire an attorney and pay him a reasonable fee, which she is entitled to recover pursuant to the Florida Civil Rights Act, Florida Statutes Chapter 760.

WHEREFORE, Plaintiff, KALICIA BATTLE, demands judgment against the Defendant for damages as set forth above, plus injunctive relief, back pay, front pay, the costs

_____
**The Firm Law Group**
14100 Palmetto Frontage Road, Suite 390, Miami Lakes, FL 33016 ▪ **ph** 305.693.8899 ▪ **fax** 305.675.0175
**www.firmlawgroup.com**

*Battle v. The City of Miami Gardens*
Complaint

of this action, attorney's fees pursuant to Florida Statutes Chapter 760, and further demands

judgment for such other relief as this Court deems just and equitable and further demands trial

by jury for all issues so triable of right by jury.

## COUNT III

### Claims for Retaliation in Violation of 42 U.S.C. Section 2000(e)-(3)(a)

131.    Plaintiff adopts and alleges the jurisdictional and general allegations of

paragraphs 1 through 110.

132.    This is an action to recover damages and injunctive relief for retaliation

brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. section 2000(e)-

(3)(a).

133.    The actions taken by Defendant are in violation of the anti-retaliation

provision of Title VII of the Civil Rights Act of 1964, 42 U.S.C. section 2000(e)-(3)(a).

134.    Plaintiff belongs to a protected class within the meaning of 42 U.S.C. Section

2000(e)-(a)(a)(1), because she engaged in protected activity through filing internal

complaints and rejecting unwelcomed sexual advances made by Chief Brooklen.

135.    Plaintiff was retaliated against for engaging in protected activity as set forth

herein. The adverse employment actions were causally related to Plaintiffs protected activity.

136.    As a direct and proximate result of the actions or omissions set forth above,

Plaintiff has sustained those damages set forth above, all of which he is entitled to recover

by law.

137.    Defendant is liable because, as set forth above, its supervisory personnel, Chief

Brooklen, was responsible for the retaliatory actions complained of, which actions were in

_____
**The Firm Law Group**
14100 Palmetto Frontage Road, Suite 390, Miami Lakes, FL 33016 ▪ **ph** 305.693.8899 ▪ **fax** 305.675.0175
**www.firmlawgroup.com**

*Battle v. The City of Miami Gardens*
Complaint

violation of law, and no corrective action to stop and/or prevent it was undertaken.

138.    As a direct and proximate result of the actions or omissions of Defendant to Plaintiff has sustained those damages set forth above, all of which she is entitled to recover by law.

139.    As a result of the deprivations of rights at the hands of Defendant to Plaintiff, Plaintiff has been forced to hire an attorney and pay him a reasonable fee, which he is entitled to recover pursuant to 42 U.S.C. Section 2000(e)-(5)(k) and otherwise by law.

WHEREFORE, Plaintiff, KALICIA BATTLE, demands judgment against the Defendant for damages as set forth above, plus injunctive relief, back pay, front pay, the costs of this action, attorney's fees pursuant to 42 U.S.C. 2000(e)-(5)(k) and further demands judgment for such other relief as this Court deems just and equitable and further demands trial by jury for all issues so triable of right by jury.

## COUNT IV

### Retaliation in Violation of Florida Civil Rights Act, Fla. Stat. Ch. 760

140.    Plaintiff adopts and realleges the jurisdictional and general allegations of paragraphs 1 through 110.

141.    This is an action for damages and injunctive relief brought pursuant to the Florida Civil Rights Act. Fla. Stat. Ch. 760.

142.    The conduct of the Defendant to the Plaintiff in relation to the conduct described above was in violation of the Florida Civil Rights Act of 1992 as established at Florida Statutes Chapter 760.

143.    As set forth above, Plaintiff engaged in protected activity through her internal

_____
**The Firm Law Group**
14100 Palmetto Frontage Road, Suite 390, Miami Lakes, FL 33016 ▪ **ph** 305.693.8899 ▪ **fax** 305.675.0175
**www.firmlawgroup.com**

*Battle v. The City of Miami Gardens*
Complaint

complaints and rejecting unwelcomed sexual advanced made by Chief Brooklen.

144.     Plaintiff was retaliated against for engaging in protected activity as set forth herein. The adverse employment action was causally related to Plaintiff's protected activity.

145.     As a direct and proximate result of the actions or omissions set forth above, Plaintiff has sustained those damages set forth above, all of which he is entitled to recover by law.

146.     Defendant is liable because, as set forth above, its supervisory personnel, Chief Brooklen, is responsible for the actions complained of.

147.     As a direct and proximate result of the actions or omissions of Defendant to Plaintiff, Plaintiff has sustained those damages set forth above, all of which she is entitled to recover under the terms of the Florida Civil Rights Act of 1992 as established at Florida Statutes Chapter 760, *et. seq.*

148.     As a result of the deprivations of rights at the hands of Defendant to Plaintiff, Plaintiff has been forced to hire an attorney and pay him a reasonable fee, which he is entitled to recover pursuant to the Florida Civil Rights Act, Fla. Stat. Ch. 760.

WHEREFORE, Plaintiff, KALICIA BATTLE, demands judgment against the Defendant for damages as set forth above, plus injunctive relief, back pay, front pay, the costs of this action, attorney's fees pursuant to Fla. Stat. Ch. 760 and further demands judgment for such other relief as this Court deems just and equitable and further demands trial by jury for all issues so triable of right by jury.

_____
**The Firm Law Group**
14100 Palmetto Frontage Road, Suite 390, Miami Lakes, FL 33016 ▪ **ph** 305.693.8899 ▪ **fax** 305.675.0175
**www.firmlawgroup.com**

*Battle v. The City of Miami Gardens*
Complaint

Dated: January 4, 2018

Respectfully Submitted:

**THE FIRM LAW GROUP**
*Counsel for Ms. Battle*
14100 Palmetto Frontage Road
Suite 390
Miami Lakes, FL 33016
Main: (305) 693-8899
Fax: (305) 675-0175
Service: Service@firmlawgroup.com
Email: Phillip@firmlawgroup.com

By:   /s/ *Phillip A. Ortiz*
**PHILLIP A. ORTIZ, ESQ.**
**FBN 98049**

_____
**The Firm Law Group**
14100 Palmetto Frontage Road, Suite 390, Miami Lakes, FL 33016 ▪ **ph** 305.693.8899 ▪ **fax** 305.675.0175
**www.firmlawgroup.com**